ANTHONY P. MILLER, INC., a New Jersey Corporation, Plaintiff,

v.

WILMINGTON HOUSING AUTHORITY, a Public Authority of the State of Delaware, Defendant.

Civ. A. No. 1739.

United States District Court
D. Delaware.

June 22, 1960.

John Van Brunt, Jr., and Courtney H. Cummings, Jr. (of Killoran & Van Brunt), Wilmington, for plaintiff.

Thomas Herlihy, Jr., and Morris Cohen, Wilmington, for defendant.

LAYTON, District Judge.

Plaintiff contractor constructed two low-cost housing developments for defendant, Wilmington Housing Author-

ity.[1]  Under the contract,[2] defendant could withhold specified liquidated damages for delay in the completion of the work, provided that

> " * * * the right of the Contractor to proceed shall not be terminated or the Contractor charged with liquidated damages because of delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor * *."

The contract also provided:

> " * * * the Contracting Officer * * * shall ascertain the facts and the extent of delay, and the Local Authority shall, subject to prior approval of the PHA, extend the time for completing the work when in its judgment the findings of fact of the Contracting Officer justify such an extension, and his findings of fact thereon shall be final and conclusive upon the parties hereto."

Pursuant to these provisions, the Contracting Officer, Dudley T. Finch, determined that a total of 303.60 (304) days of the actual overrun of 465[3] days was justifiable as beyond the Contractor's control.  Subtracting 304 from 465 left 161 days for which defendant withheld liquidated damages from payments to plaintiff.[4]  Plaintiff sues to recover these liquidated damages.  Execution of the contract as well as the sums withheld is not in dispute.

The total of 304 days' delay allowed the Contractor was the result of eight causes.  Only one of those causes, shortages of labor, is now contested.  Plaintiff requested an allowance of 226 days for this cause, and Finch granted only 20.93 days.[5]  The evidence shows that Finch used a six-step formula in making his calculations.  In the case of plumbers, for example, he

(1) Determined the period of time during which there existed a shortage of plumbers, i. e., 573 days;

(2) Determined that during that period there were 209.17 days during which delays had occurred for other reasons (strikes, inclement weather, change orders, etc.);

(3) Deducted this concurrent period of delay from 573, leaving 363.-83 days, which is the period of shortage of plumbers;

(4) Determined there was a percentage shortage of 50%·;

(5) Determined that since the contractor had only one-half his plumbing force, he must have necessarily taken twice as long to do the job, and, therefore, dividing 363.83 days in half, the contract was delayed 181.92 days because of this shortage;

(6) Reduced the figure of 181.92 days to 15.19 days[6] by applying a ratio of the cost of the plumbing contract to the cost of the entire contract.

---

1. The facts of this case are fully set forth in two prior opinions on other phases in 165 F.Supp. 275 and 179 F. Supp. 199. ·

2. Two contracts are involved, one for the Eastlake Extension and one for Southbridge Extension.  However, except for the amounts involved, both contracts are identical in language and the action raises questions of law common in both. Only the Eastlake Extension contract will therefore be discussed.  Decisions as to Eastlake will necessarily be dispositive of questions raised as to Southbridge.

3. There was an actual overrun of 465 days for Southbridge also.

4. With respect to Southbridge, the Contracting Officer determined that of the 465 days overrun, 329 were justifiable, leaving 136 days for which defendant withheld liquidated damages.  A total of $23,928 is witheld under Eastlake contract and $24,580 under Southbridge.

5. 183 requested and 14.25 allowed for Southbridge.  Of the 20.93 allowed on Eastlake, 15.19 were the result of plumbers' shortages, and 5.74 the result of electricians'.  Of the 14.25 days allowed for Southbridge, 9.25 were for plumbers, and 5 for electricians.

6. 221.5 reduced by 50% to 110.75 for Southbridge.

The sixth step of this calculation was held by this Court to be so grossly erroneous as to constitute constructive fraud, and therefore not binding on the parties, 179 F.Supp. 199. This was true also of the calculations made as to the other trades. It remains to be decided, therefore, what period of justifiable delay resulting from labor shortages the Contractor may claim against the liquidated damages withheld for overrun in completion of the contract. The real issue remaining in the case, therefore, is which, if any, of Finch's calculations, set forth above for the case of plumbers, are findings of fact and therefore binding.

The sixth step, as noted, is out. Defendant argues that the foregoing five steps are necessarily eliminated also for two reasons: (1) because they are not stated as formal findings of fact by the Contracting Officer, and appear only in his work sheets, and (2) because the entire six-step calculation was an integral process and voiding the last step vitiates the entire approach. I disagree.

▪ The first five steps are inherently "findings of fact" within the meaning of the contract. A careful scrutiny of the contract reveals that the method contemplated for the ascertainment of justifiable delay consists of (1) the Contracting Officer's findings that certain delays in the progress of the work did occur, (2) the Contracting Officer's determination of which of these delays in the progress of the work actually delayed completion of construction, and (3) the Local Authority's determination as to which of these delays occurred without the fault or negligence of the Contractor. In his first five steps, Finch completed

(1) and (2). He apparently equated delay in progress with delay in completion. This was a decision for him and is binding. Then, by means of his sixth step, Finch reached his ultimate conclusions as to justifiable delay and stated these as formal findings of fact. The Local Authority voted approval of these ultimate conclusions. The nature of the "sixth step" which was set aside is clearly distinguishable from that of the first five, which were binding findings of fact within the meaning of the contract.[7]

The answer to defendant's objection that the entire method was an integral process and the initial steps meaningless without the last is in the record. Four experts in the construction trade, two called by plaintiff and two by defendant,[8] testified that a reasonable ultimate conclusion as to justifiable delay might be reached upon the basis of Finch's first five findings. This manifestly overwhelms Finch's hindsight testimony that if he had known that the sixth step could not be used, he would not have used the approach he did at all.

▪ Not only did all four experts testify that a rational conclusion might be reached upon the basis of the first five findings, but with one irrelevant reservation[9] on the part of defendant's experts, they all agreed on what that conclusion would be. The delay allowable to plaintiff for labor shortages would be the longest delay experienced in any one trade, provided that delays in the other trades occurred during the period of the longest delay. Since the delays found by Finch to have resulted from shortages of electricians, plasterers and latherers were entirely overlapping[10] and all

---

7. This is consistent with the Court's ruling at trial that no defense evidence of lack of labor shortages might be admitted because of the finality of Finch's findings in that respect.

8. Messrs. Edmond J. Fitzmaurice and William B. Seaver for plaintiff and Messrs. George E. Pope and Eugene D. Di Sabatino for defendants.

9. That reservation was a disagreement with what they considered a premise in

Finch's method, that a contractor might start work without any stable labor force. They felt that a determination of a 50% labor shortage in any one trade based on such a premise is unrealistic. That may be true, but nevertheless, the observation is irrelevant because it strikes at Finch's initial findings.

10. In his formal findings of fact, Finch found that the shortage of plumbers extended over a period from Oct. 8, 1952, to May 4, 1954, (same period for South-

shorter than that in the case of plumbers, the result under these experts' testimony would be to allow plaintiff Contractor 181.92 days under Eastlake and 110.75 days under Southbridge as justifiable delays for labor shortages. Therefore, subtracting the short periods erroneously allowed for this cause from the totals of justifiable delay under both contracts, and adding instead these periods just found, the result is that an overrun of 464.59 (465) days occurred as to Eastlake without the fault or negligence of the Contractor, and 425.25 days as to Southbridge. Fortuitously for plaintiff, the adjusted period for Eastlake amounts to the actual overrun of 465 days, relieving plaintiff of liability for any liquidated damages thereunder. However, plaintiff is liable for liquidated damages for 40 days on the Southbridge contract, which, at $180 per day amounts to $7,200. Subtracting this from the total withheld of $48,508, plaintiff is entitled to judgment for $41,308.

In conclusion, it may be noted that contracts of this sort are designed to operate most favorably to the contracting Authority and against the contractor for the reasons that (1) the contracting agent is usually an appointee of the Authority and naturally inclined to favor it and (2) the Courts have almost uniformly held that the findings of such an agent may be set aside only in the event of actual or constructive fraud.

Under such circumstances, it would seem most inequitable to the contractor to throw out completely all the findings made by Finch which operated *in his favor* merely because Finch's ultimate conclusion (the sixth step which constituted no finding at all and *was unfavorable to the Contractor*) was emasculated by the Court.

■ This is not to say that I was not impressed by the testimony of defendant's experts, Mr. Pope and Mr. Di Sabatino. Their conclusions were interesting and persuasive but not acceptable in this case because (1) they failed to adopt Finch's findings as the basis for their conclusions and (2) their admissions that reasonable conclusions differing from their own might be drawn based solely on Finch's findings.

The Wire Mesh Question

Plaintiff also sues for $3,626.96 under the Eastlake contract and $3,843.64 under the Southbridge contract as the cost of installing wire mesh in certain concrete slabs. Plaintiff claims these as compensable extras because not required by the contract. The facts in full on this question are set forth in this Court's prior opinion on summary motions in this case, 179 F.Supp. 199.

■ It is my conclusion that plaintiff is not entitled to recover these costs. Testimony was adduced to the effect that the words "vermiculite and conc.[concrete]" in the column headed "reinforcing" constituted an obvious error to persons in the trade, and that the only reasonable course of action before submitting a bid would be to inquire with respect to the meaning. This accords with a common sense interpretation of the situation. Plaintiff did not do this, but submitted a bid apparently on the basis that no wire mesh reinforcing was contemplated by the specifications and drawings for those slabs. This assumption was unwarranted, and plaintiff cannot now recover because of carelessness or a mistake in judgment on its part in submitting its bid.

Let an order be entered in accordance with the foregoing.

bridge), that the shortage of electricians extended over a period from Aug. 17, 1953, to April 9, 1954, (same period for Southbridge), and that for both contracts, " * * * extensions of time herein granted for other delays cover all periods in which any shortages of other trades could have existed."